No. 22,201.

THE WICHITA UNION TERMINAL RAILWAY COMPANY, *Appellee*, v. THE KANSAS CITY, MEXICO & ORIENT RAILROAD COMPANY, *Appellant*.

### SYLLABUS BY THE COURT.

1. FORECLOSURE—*Railroad Property—Option to Adopt Certain Executory Contracts—Interpretation of Decree of Foreclosure.* The foreclosure decree giving the Kansas City, Mexico & Orient Railroad Company, which purchased the property of the Kansas City, Mexico & Orient Railway Company at the sale made under the decree, an option, to be exercised within six months, of adopting or repudiating executory contracts of the railway company, interpreted.

2. CONTRACT — *Railroads — Operating Agreement Interpreted.* The contract called the operating agreement, made by the railway company with the Wichita Union Terminal Railway Company, which built and owns the Wichita union station and terminal facilities, relating to use of the station and facilities, and other subjects, interpreted.

3. DECREE OF FORECLOSURE—*Option—Operating Agreement Adopted—No Subsequent Repudiation.* The evidence examined, and *held*, the railroad company exercised its option to adopt or repudiate the operating agreement, and adopted it. *Held further,* the terminal company did not consent to or acquiesce in a subsequent effort of the railroad company to repudiate that agreement, attempted within the time stated in the decree.

Appeal from Sedgwick district court, division No. 2; THORNTON W. SARGENT, judge. Opinion filed July 5, 1919. Affirmed.

*D. W. Eaton,* of Wichita, and *H. S. Garrett,* of San Angelo, Texas, for the appellant.

*R. R. Vermilion, Earle W. Evans, Joseph G. Carey,* and *W. F. Lilleston,* all of Wichita, for the appellee.

The opinion of the court was delivered by

BURCH, J.: The action was one to recover sums of money claimed to be due the plaintiff on account of adoption by the defendant of certain contract relations between the plaintiff and the defendant's predecessor, the Kansas City, Mexico &

Orient Railway Company, described in the opinion in the case of *Street Railway Co. v. Railroad Co.*, 100 Kan. 83, 163 Pac. 1067. The plaintiff recovered, and the defendant appeals.

The Kansas City, Mexico & Orient Railway Company, with three other railway companies, subscribed capital stock and organized the terminal company. The terminal company built the Wichita union station and terminal facilities, from funds derived from sale of bonds, secured in part by pledge of terminal-company stock. The four proprietary companies entered into a contract with the terminal company, called the operating agreement, which fixed the rights and obligations of the contracting parties with respect to various subjects. Among them were maintenance and use of the terminal facilities; revenues derived from station concessions, leases of portions of the terminal facilities, and other sources; current expenses for maintenance and operation; and fixed charges, such as interest on bonded debt and taxes on the terminal property. Under a foreclosure decree of the federal district court, the property of the Kansas City, Mexico & Orient Railway Company was sold on July 6, 1914, to the defendant, which proceeded to use the terminal company's station and other facilities, and otherwise to conduct its affairs as if it were a party to the operating agreement. On January 2, 1915, the defendant served notice on the terminal company that it repudiated the operating agreement, claiming the right to do so under subdivision 18 of the foreclosure decree, which provided as follows:

"The purchaser shall have the option, to be exercised within six months from and after the sale, of adopting or repudiating any and all executory contracts of the railway company."

On January 5, 1915, the defendant discontinued use of the union station.

The plaintiff, claiming the defendant adopted the operating agreement, sued for the defendant's proper proportion of taxes on the terminal property for the year 1914 and subsequent years, the defendant's proper proportion of interest on bonded debt, payable on May 1 and November 1, of the year 1915 and subsequent years, and the defendant's proper proportion of other items payable according to the operating agreement. The defense was that the operating agreement was repudiated by service of notice and discontinuance of use of the terminal

facilities within the six months' period fixed by the foreclosure decree. A further defense was, that if prior to January 2, 1915, the defendant had so conducted itself as to become bound by the operating agreement, it rescinded its action by notice and consistent conduct, to which rescission the plaintiff impliedly assented. The plaintiff ·pleaded that adoption of the operating agreement was adjudicated in the earlier litigation.

The facts are not in dispute. The evidence is documentary, with the exception of some explanatory and supplementary testimony conceded to be true, and the disagreement between the parties relates to the conclusions of fact and conclusions of law to be drawn from the evidence. The defendant claims it had the right to experiment with the operating agreement precisely as if it were a proprietary company, accept all the benefits and perform all the obligations, cast up the results at the end of six months, and then adopt or repudiate, as advantage or disadvantage might appear. The plaintiff's plea of *res judicata* will be left at one side, and this claim will be considered.

The sale under the foreclosure decree was made and confirmed, and the master's deed was issued on July 6, 1914. At midnight of that day the defendant entered into possession under the deed. Pending the litigation, the railroad had been operated by a receiver. The defendant was confronted by a network of contract and other relationships, including duty to the public, by questions relating to present rehabilitation of the property, and future improvements and extensions, and by many other pressing questions of much gravity; and its trains were running into the Wichita union station. Manifestly, the defendant could not do everything at once. It was entitled to time in which it could find itself, consider operating and other conditions, and determine what arrangements for the future it desired to make. The time allowable within which this might be done was a reasonable time, and the federal court, for its purposes, fixed a limit of six months, which was a reasonable time.

The defendant, by its purchase, acquired everything belonging to its predecessor which could be sold, including whatever interest its predecessor, as one of the proprietary companies, had in the operating agreement. The defendant did not, by its

purchase, acquire any of the executory obligations of its prede-
cessor, and was not bound, unless it so elected, by the operat-
ing agreement.   The operating agreement was of a peculiar
character.   The defendant could not adopt its benefits without
accepting its burdens; and whenever the defendant reached
the point of choosing its final policy it was obliged to take that
agreement, or leave it, as an entirety.

The federal court decree granted the defendant an option.
The option was not one to wait six months and then decide
what to do; the option was "to be exercised within six months."
The option was one "of adopting or repudiating" executory
obligations of the old company.   It was not an option to adopt,
and then, if deemed wise, to repudiate within the six months;
and whenever the defendant made its decision, whether to
adopt or to reject, it exhausted its privilege.

The terminal company, and the proprietary companies other
than the defendant's predecessor, were not parties to the fed-
eral court decree.   That decree could not commandeer the
plaintiff's property for use by the defendant; neither could the
decree make a new operating agreement between the terminal
company and the defendant.   All that decree could do was to
protect the defendant in the exercise of an election to which it
was justly entitled under the circumstances.

In making its election the defendant was a perfectly free
agent.   Its adoption or repudiation of the operating agreement
did not require sanction of the federal court, and it was obliged
to determine its policy precisely as it determined any other
business policy; that is, according to the sagacity and judg-
ment of its managers.   Because of the number and complexity
of the problems confronting those managers on July 6, 1914,
they were allowed reasonable time and opportunity to consider
each one, and arrive at a conclusion respecting the proper
course to be pursued.   They were not, however, allowed time to
try out a particular solution of a given problem, by experi-
menting with the money, credit and property of others, and
then, if the experiment failed to reveal sufficiently attractive
advantages, to reverse themselves and adopt some other policy.
If that is what the defendant did with respect to the operating
agreement, it adopted that agreement when it entered on the
experiment.

The conduct of the defendant during the suspense period may now be considered.

Current revenues and expenses of the union station were apportioned monthly among the proprietary companies. While the defendant used the station, its share of revenues exceeded its share of expenses, and for five months it received and kept the net profits, as follows:

| | |
|---|---|
| July, 1914 | $259.87 |
| August, 1914 | 205.81 |
| September, 1914 | 143.00 |
| October, 1914 | 187.00 |
| November, 1914 | 336.60 |

It may be remarked here that a voucher was made to the defendant for its surplus of receipts over expenditures for the month of December, 1914, in the sum of $134.54, but the voucher has not been paid. The evidence does not show refusal to pay, and credit for the amount was given the defendant in a statement of indebtedness rendered to it on May 5, 1915.

The defendant purchased at the foreclosure sale the shares of stock of the terminal company which the Orient Railway Company had subscribed. An assessment, made shortly before the defendant purchased, was not paid. In October, 1914, the defendant assumed the obligation, and undertook to discharge it in the manner described in the opinion in *Street Railway Co. v. Railroad Co.*, 100 Kan. 83, 163 Pac. 1067. As indicated in the former opinion, stock in the terminal company would not be an object to any owner except one having the rights and privileges conferred by the operating agreement.

On November 1, 1914, interest on bonded debt fell due. The plaintiff requested the defendant to pay its share, according to the terms of the operating agreement. The request was complied with, and on October 20 the defendant paid to the plaintiff the sum of $11,675.54, on that account.

On December 1, 1914, the plaintiff sent the defendant a statement of its proportion of the taxes due on the terminal property for the year 1914. Not receiving a remittance, the plaintiff drew for the amount. The draft was presented on December 18, and was returned unpaid, with the following notation: "Payment refused because of negotiations for disaffirmance of contract."

It seems that the negotiations referred to were for terminal facilities to be supplied by the Missouri Pacific Railroad Company. On December 21 the plaintiff wrote the defendant for an explanation of its attitude. On December 31 the defendant's executive committee adopted a resolution to abrogate the operating agreement. On January 1, 1915, the defendant replied to the plaintiff's letter of December 21, stating that the operating agreement had been abrogated, and on January 2, 1915, formal notice to that effect was served. On January 5 the defendant discontinued use of the union station and terminal facilities.

It seems to the court quite clear that the conduct of the defendant from December 31, 1914, to January 5, 1915, constituted abandonment of adopted policy, and not initial adoption of policy. In the former opinion it was said:

"In order to avail itself of the provision of the decree allowing the purchaser of the property of the Orient Railway Company six months within which to adopt or repudiate its existing executory contracts, it would seem that the new company was required to elect once for all which it would do; that when it accepted an advantage under such a contract, or in any way asserted successorship to the rights of the old company with respect thereto, it committed itself finally to the adoption of the contract, and could not thereafter repudiate the corresponding obligations; that in accepting a part of the revenue of the union station it had adopted the operating agreement; and that in offering to turn over its gold notes in payment of the subscription it had definitely elected to retain the ownership of the stock, and to assume the burdens incidental thereto." (p. 89.)

That the defendant had fully determined the course it would pursue was further indicated by recognition of the obligation to pay interest on the bonded debt of the terminal company, in accordance with the operating agreement.

Of course, the defendant could not use the plaintiff's terminal facilities for six months for nothing. In the absence of special agreement, the defendant would be liable for reasonable rent. The operating agreement contemplated admitting railway companies other than the proprietary companies to use of the station and other facilities, and provided for application and division of revenues received from that source. There is nothing in the evidence to suggest that a proper rent charge would bear even a remote resemblance to the net result of ownership of a proprietary interest in the operating agree-

ment. Besides that, the relation of user by court sufferance, under an implied obligation to pay reasonable rent, was utterly incompatible with the relation of proprietary company under the operating agreement, and when the defendant voluntarily assumed the latter relation, it necessarily adopted the operating agreement.

There is no doubt that the plaintiff did not consent to abrogation of the operating agreement.

After January 5, 1915, the plaintiff continued for a time to credit the defendant with its share of the revenues produced by the station. In May, 1915, however, the accounts were recast, and the defendant's name was eliminated from the plaintiff's books, so far as station revenues and expenses were concerned. It is said that this indicates acquiescence in the status attempted to be created by the notice of January 2. The operating agreement provided for division of revenues among proprietary companies using the station, and for division of expenses among proprietary companies on a wheelage basis. Because the defendant did not use the station after January 5, it was not entitled to revenues, and because it had no wheels in the station after January 5, there was nothing to charge against revenues; consequently, the change in bookkeeping was made pursuant to the operating agreement, and not pursuant to an abrogation of that agreement.

It is said the plaintiff discontinued rendering statements of account to the defendant, and in that way indicated acquiescence in the defendant's repudiation of the operating agreement. What the plaintiff did was to discontinue, in view of the defendant's pertinaciousness, wasting time, paper, and postage. The plaintiff did extend credit on its books for the defendant's share of revenues in the months of January, February, March, and April, 1915, and did send bills in the months of January, February, and March. Interest on bonded debt fell due May 1, 1915. On April 20 the plaintiff sent the defendant a statement of its share. On April 21 the defendant wrote the plaintiff as follows:

"In reply to your favor of April 20, file D-89, with reference to payment of your company's bill No. 133 for $9,452.43. When draft is presented we will be compelled to refuse its payment, owing to abrogation on our part of the contract as of January 6, this year."

The plaintiff drew on the defendant for the amount, but payment of the draft was refused. In this way the defendant made its position very clear to the plaintiff. On May 5 the plaintiff made its position equally clear to the defendant, by sending the defendant an itemized statement of all sums claimed to be due from November 1, 1914, to April 30, 1915, and of all credits, together with the following letter:

"The Kansas City, Mexico & Orient Railroad Company is a stockholder in the Wichita Union Terminal Railway Company at Wichita, Kansas, and is a party to the operating and stock trust agreement entered into by four lines operating in the city of Wichita. Under the terms of that operating agreement I beg to enclose statement of the amount due from the Orient line for their proportion of interest, taxes, and expenses for 1914 and part of 1915, as per details, total of the statement being $13,975.69. I would appreciate your giving this statement careful consideration and advise me if you will arrange for early settlement of the account."

On May 11 the secretary and treasurer of the plaintiff wrote the plaintiff's attorney, calling attention to a board decision to sue the defendant on its refusal to make settlement of sums due from it, and suggesting early action.

It is not necessary to pursue the subject further. The evidence does not sustain the defense that the plaintiff consented to the defendant's attempted repudiation of the operating agreement.

This court concludes, as a matter of fact, that after the defendant entered into possession of the property and privileges derived through the federal court decree and sale, it exercised its option to adopt or repudiate the operating agreement, and adopted that agreement; and that the plaintiff did not consent to or acquiesce in the defendant's subsequent attempt to repudiate that agreement by action of its executive committee, notice of January 2, 1915, and other conduct. The result is, the attempted repudiation of the operating agreement was nugatory, and the defendant is obligated to pay the sums due according to the terms of that agreement.

The judgment of the district court is affirmed.