### DETROIT & T. S. L. R. CO. v. DETROIT, T. & I. R. CO.

(District Court, E. D. Michigan, S. D. May 14, 1923.)

No. 94.

1. **Specific performance** ⊚➔16—**Not refused because burdensome, if fair when made.**

A court of equity will not refuse specific performance of a contract on the sole ground of hardship, where it was fair when made and has become a hard one through the force of subsequent circumstances and changing events.

2. **Specific performance** ⊚➔64—**Contract giving continuing right to use railroad tracks enforceable.**

A railroad company *held* entitled to specific enforcement of a contract, if valid, giving it a continuing right to use tracks of another company to reach and serve certain industries, both on the ground that its remedy at law, if it should be excluded from such use, would be inadequate, and also because public interests are involved.

3. **Railroads** ⊚➔194(5)—**Purchaser at foreclosure sale held to have succeeded to contract of mortgagor.**

A railroad company, after execution of a mortgage on its property, entered into a contract by which it gave to another company a continuing right to use certain of its trackage for a monthly rental. On foreclosure of the mortgage the receiver performed the contract and accepted the rental, as did the company which succeeded to the ownership through the foreclosure sale and deeds and bills of sale from the special master receiver and mortgagor company conveying the property and its "rents, issues, and profits", *held*, that such company succeeded to the contract as an asset of the mortgagor, whether or not it was covered by the mortgage as after-acquired property.

4. **Receivers** ⊚➔90—**Receivers, who continue to give and accept performance of personal contracts, are bound thereby.**

Receivers may, within a reasonable time after taking possession of property subject to their receivership, elect whether to adopt or reject executory personal contracts pertaining to such property, and if they do not reject within a reasonable time, but continue to give and accept performance of such contracts, they become bound thereby.

5. **Receivers** ⊚➔90—**Under order of appointment, acceptance of performance of contract by receivers held not affirmance.**

Under a provision, in an order appointing receivers, that they should not, without approval of the court, elect to affirm, ratify, or continue any contract of defendant, and giving them six months within which to make such election, their continuing to perform a contract after the six months without making any election was not an affirmance, and did not deprive them of the right to reject it at any time during the receivership.

⊚➔For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

**6. Receivers** ⊚⇒90, 95—**Are without power to cancel a contract as between the parties, but may by contract reserve right to reject.**

Receivers have no power to annul or abrogate an executory contract, or lease as between the parties thereto; but a receiver may enter into an arrangement whereby he reserves to himself the right to adopt or reject at any time during the receivership.

**7. Receivers** ⊚⇒90—**Performance of contract by receiver of party is performance by the party.**

Appointment of a receiver for a party to an executory contract is not a breach of the contract, and does not terminate it, where it is performed by the receiver throughout the receivership.

**8. Railroads** ⊚⇒194(3)—**Contract existing when mortgage was given passes under foreclosure sale as mortgaged property.**

An executory contract by a railroad company, existing when it executed a mortgage on all its property, passed under the mortgage, and passes to a purchaser at foreclosure sale as mortgaged property.

**9. Estoppel** ⊚⇒83(1)—**Action through mistake of law held not to create estoppel.**

One party *held* not estopped to assert that a contract was still in force because, through a mutual mistake of law, the parties negotiated for a new contract on the assumption that the old one had been canceled, though the representation was made that the contract was canceled.

**10. Estoppel** ⊚⇒70(2)—**Failure to give notice of claim held not to create estoppel.**

Under a decree foreclosing a railroad mortgage, requiring the purchaser to disavow any contract or lease which was part of the property to be sold within 90 days or be bound thereby, it was not the duty of another company having a trackage lease to notify the purchaser within the 90 days that it claimed rights thereunder, and its failure to do so did not estop it from afterward asserting its claim.

**11. Estoppel** ⊚⇒95—**Silence will not create estoppel, where facts are equally open to both parties.**

The silence of a party will not create an estoppel, where the facts are known to both parties, or the means of knowledge is equally open to both.

**12. Railroads** ⊚⇒194(3)—**Contract held adopted by purchaser at foreclosure sale.**

Under a decree foreclosing a railroad mortgage permitting the purchaser within 90 days to disavow any contract or lease which was part of the property to be sold, but providing that contracts and leases of which the purchaser "has notice after inquiry made of the receivers" not so disavowed should be deemed adopted by him, the purchaser was not relieved from the necessity of disavowing a contract of which he had knowledge because of an opinion expressed by the receiver that it had been canceled, and where such opinion was erroneous as matter of law, and the contract was not disavowed, the purchaser became bound thereby.

In Equity. Suit by the Detroit & Toledo Shore Line Railroad Company against the Detroit, Toledo & Ironton Railroad Company. On exceptions by parties to master's report and motions by defendant for confirmation of master's report and assessment of damages. Complainant's exceptions sustained, and decree for complainant.

H. R. Martin, of Detroit, Mich., and H. W. Morgan, of Toledo, Ohio, for plaintiff.

Alfred Lucking and William Lucking, both of Detroit, Mich., for defendant.

⊚⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

TUTTLE, District Judge.   This is a suit by the Detroit & Toledo Shore Line Railroad Company against the Detroit, Toledo & Ironton Railroad Company to compel performance of a contract, dated July 1, 1903, between the plaintiff and the Detroit Southern Railroad Company.   Since the execution of that contract, the tracks and facilities covered by it have passed through two mortgage foreclosureships in this court, the Detroit, Toledo & Ironton *Railway* Company and the present defendant, the Detroit, Toledo & Ironton *Railroad* Company, having become successively the owners thereof.   The defendant, Detroit, Toledo & Ironton Railroad Company, being the company organized after the second foreclosureship, denies that the contract in question is binding upon it.

The contract grants to the plaintiff, for the term of 99 years, the use, jointly with the owner company, of the tracks covered thereby, extending from Trenton to Delray, Mich., about 11 miles in length, for the purpose of enabling the plaintiff to reach the various industries located along said tracks.   The contract fixes an annual rental of $6,000, payable in monthly installments of $500 each, and also requires the plaintiff to pay annually 2 per cent. on the cost of betterments and improvements made during its continuance, and also a proportion of the maintenance and operating expenses on a car and engine mileage basis, not below a specified minimum.   It gives to the plaintiff the use of side tracks existing at its date, and covers the building of new sidings, giving to the plaintiff the right to the use of new sidings on paying annually 2 per cent. of the cost, thus making effective the declared purpose of enabling the plaintiff to reach industries along said tracks.   It provides that it shall apply to and be binding upon the successors and assigns of the parties thereto as fully in all things as upon the parties themselves.

At the time of the execution of this contract, the Detroit Southern had outstanding a bond issue, secured by a mortgage, dated June 1, 1901, covering all its tracks and property, the use of which was granted plaintiff by the contract.   In August, 1904, in a creditors' suit against the Detroit Southern, Samuel Hunt was appointed by this court receiver of its property and took possession thereof.   In February, 1905, suit in equity was commenced in this court for the foreclosure of the above-mentioned mortgage, and, in an order consolidating the creditors' suit with the foreclosure suit, Hunt was appointed or continued as receiver in the consolidated suit.   During the receivership of Hunt, the plaintiff continued its use of the tracks in question, paying rental to the receiver under the contract.   Foreclosure sale followed very shortly, sale being made to Otto T. Bannard, as purchaser, and conveyance was made to him by master's deed, under date May 1, 1905, of the property.   Bannard, under the same date, executed a quitclaim deed to the Detroit, Toledo & Ironton Railway Company, and the Detroit Southern, and Hunt, receiver, at the request of the purchaser, Bannard, also under the same date, executed deeds and bills of sale to that company, all pursuant to the provisions of the foreclosure decree.   Thereby the Detroit, Toledo & Ironton Railway Company became the owner of the tracks in question, formerly owned by the Detroit

Southern, and also of the latter company's rights or interest in the contract in question; and thereafter the Detroit, Toledo & Ironton Railway Company performed the contract as the successor of the Detroit Southern until the commencement of the second foreclosure suit in 1908, a period of nearly 3 years.

The Detroit, Toledo & Ironton Railway Company, under date May 2, 1905, executed two trust deeds, to secure bond issues, the first to the New York Trust Company, as trustee, and the second to the Knickerbocker Trust Company, as trustee. These mortgages covered all the property which had passed by the foreclosure sale and by the deeds and bills of sale above mentioned. Immediately following this reorganization, the Detroit, Toledo & Ironton Railway Company wrote the plaintiff that it reserved the right to reject or accept contracts operated under by the Detroit Southern, or the receiver, and that such matters would be brought to the attention of its "duly constituted authority" for prompt action as soon as its permanent organization was effected, and that the plaintiff would be advised of the result. No action was taken by the Detroit, Toledo & Ironton Railway Company to reject the contract in question, but, on the contrary, that company and the plaintiff thereafter continued in all respects to perform this contract; the plaintiff using the tracks in question as granted by the contract, and paying rental and other charges to the Detroit, Toledo & Ironton Railway Company in accordance with that contract. This course continued uninterruptedly, as above stated, until the commencement of the second foreclosureship in 1908, a period of nearly 3 years, when the receivers appointed in that suit took possession.

In February, 1908, the Knickerbocker Trust Company commenced suit in this court to foreclose the trust mortgage running to it as trustee, and Benjamin S. Warren, George K. Lowell, and Thomas D. Rhodes were appointed receivers of the railroad and property of the Detroit, Toledo & Ironton Railway Company. The order appointing them receivers provided that nothing in it should be construed as an affirmance, ratification, or continuance of any contract or lease held or owned by the Detroit, Toledo & Ironton Railway Company, unless they, with the previous approval of the court, should expressly elect to affirm, ratify or continue same, and they were given 6 months' time within which to exercise such election as to any such contract or lease which by its terms was to continue in effect for a period of 6 months or more.

No formal action was ever taken by this court with respect to the contract in question. Lowell, one of the receivers, did confer with Judge Swan, District Judge of this court, about the continuance of this contract by the receivers, and was told by Judge Swan that the receivers might "cancel" it, but that anything they did would be effective only during the receivership. Following this informal conference, plaintiff received a letter dated June 11, 1909, from the receivers, to the effect that they did not desire to continue under the agreement of July 1, 1903, although they were willing to make a new arrangement satisfactory to them as receivers, and that they would expect the plaintiff to vacate the tracks on July 31, 1909, unless, in the meantime,

an arrangement satisfactory to them as receivers should be made. (This letter made reference to an alleged notice of cancellation claimed to have been given at the time of the organization of the Detroit, Toledo & Ironton Railway Company, but there is nothing in the record tending to show that any such notice had been given.)

Following this letter of June 11, 1909, conferences were held between one of the receivers, Lowell, and representatives of the plaintiff. Lowell testified that he told plaintiff's representative (Lowell thought his talk was with Mr. A. B. Atwater, but the latter denied any such conversation, and Main, plaintiff's then superintendent and traffic manager, testified that he had a conference with Mr. Lowell about that time) that he wanted it understood that the contract was "canceled," but that the plaintiff might continue under the "present arrangement"; that it was his understanding that that arrangement was to "continue as far as my [his] receivership was concerned." Main testified that Lowell told him that there was no intention or desire on the receivers' part to put the plaintiff off the tracks; that in making a new contract there was to be no change in the terms, so far as compensation was concerned, but that the receivers merely wished to have the phraseology of the contract in harmony with certain of their other contracts. Fitzhugh, plaintiff's vice president and one of the two members of its executive committee, testified that Lowell told him that the receivers did not feel they were receiving sufficient compensation for the use of the tracks in question; that he asked Lowell to permit the plaintiff to continue the use of these tracks upon the same terms until a new arrangement should be negotiated, or until the plaintiff could otherwise arrange to connect up its lines with the Grand Trunk at Detroit, and that Lowell replied that "he had no desire to embarrass us [plaintiff], and that he was willing to continue the arrangement [contract dated July 1, 1903] pending a new agreement." As a result of these conferences, therefore, it was understood that the plaintiff should continue its use of the tracks under the terms of the contract, on the same rental basis, pending the negotiation of a new arrangement between the receivers and the plaintiff, or until the receivers should exercise the right, which they expressly reserved, to refuse to permit the plaintiff to continue to use the tracks. The legal effect of this arrangement is in dispute between the parties to the present suit. The plaintiff claims that its effect was only to reserve to the receivers the right to reject the contract at any time during the receivership, while the defendant claims that its effect was to terminate for all purposes this contract. The plaintiff claims that the receivers as such had no legal authority to terminate or cancel this contract as between the parties thereto, but could only reject it as binding upon them.

Following these conferences, the plaintiff continued to use the tracks exactly in the manner permitted by the contract, and to pay rental and other charges to the receivers on the basis of the contract, all during the receivership. The rental and other charges were billed by the receivers to the plaintiff under bills, in nearly every instance, making express reference to the contract as the basis therefor, and plaintiff issued its vouchers, as a rule making like reference to the contract, and its checks in payment, which were accepted and cashed by the receivers.

In January, 1910, the New York Trust Company commenced a foreclosureship suit in this court for the foreclosure of the trust mortgage running to it as trustee. This suit was consolidated with that commenced by the Knickerbocker Trust Company in February, 1908, and the powers of the receivers in the latter suit were extended to cover the consolidated suit.

Warren, Lowell, and Rhodes resigned as receivers in May, 1912, and George P. Johnson was appointed sole receiver in their stead, and continued as such until the conclusion of the receivership, on the organization of the present defendant and the passing to it of conveyances on March 1, 1914, of the property sold at foreclosure sale. During Johnson's receivership, the plaintiff continued to use the tracks, and to pay rental and other charges exactly as before, under the billing and vouchering method already described.

The use made by the plaintiff of these tracks during the receivership of Johnson consisted in the running over them of a few freight trains nearly every day. The contract of July 1, 1903, provided, as above stated, that maintenance and operating expenses should be apportioned against the plaintiff on the basis of car and engine mileage, and the bills rendered covering the period of Johnson's receivership show that the plaintiff was paying, for many periods covered thereby, more than one-half of the total of such expenses, which indicates that the receiver's use of these tracks was even less extensive than that of the plaintiff. The very nature of the contract of July 1, 1903, and the uses respectively made by the plaintiff and the receiver, conclusively show that the monthly rental of $500 paid to the receiver under this contract was sure, and practically "clear profit" to him. All the files and records in the foreclosureship suits have been offered and received in evidence; these files contain the receiver's reports, and it thus appears that the rental under the contract of July 1, 1903, was a very important revenue accruing during the receivership, as the receiver had great difficulty in meeting his expenses.

In March, 1913, Johnson, as receiver, wrote plaintiff suggesting a new contract with the receiver, sending it a draft of his proposed new contract. This proposed new contract was unsatisfactory to plaintiff, and some correspondence followed relative to plaintiff's objections. No agreement was arrived at between plaintiff and Johnson, receiver. In the course of their negotiations, the subject of "joint ownership" was opened up, the idea being that plaintiff might purchase a half interest in the tracks in question. Some correspondence and, conferences followed relative to the subject of "joint ownership," and the plaintiff went so far as to have a valuation of the property made, sending the receiver the result of its valuation, under date October 30, 1913.

The foreclosure sale took place on June 28, 1913. The purchasers at this sale were Otto T. Bannard and M. N. Buckner, a purchasing committee for the bondholders. Bannard was president of the New York Trust Company, which was trustee under one of the mortgages being foreclosed, and was also chairman of the bondholders' committee. He had been the "purchasing committee," who purchased at the first foreclosure sale in 1905. Buckner was vice president of the New York

Trust Company. Bannard admitted in his testimony that he knew, as early as the fall of 1912 or during the fore part of 1913, that the plaintiff was using the tracks in question, and paying rental for such use; in fact, that he had this information from the commencement of the foreclosureship suit in 1908; that there was or had been some old agreement between the plaintiff and the Detroit, Toledo & Ironton Railway Company; that he talked with Johnson, receiver, about this "old agreement," and that Johnson felt it was unfair, as not giving sufficient rental, and that it had been "canceled"; and that he (he then having been chairman of the bondholders' committee) received from Johnson, receiver, a letter, dated March 11, 1913, in which was inclosed a copy of the contract of July 1, 1903 (the contract here involved), in which letter Johnson stated as follows:

"In view of the early termination of the receivership, we deem it expedient to call your attention to conditions existing between the Detroit, Toledo & Ironton Railway and the Detroit & Toledo Shore Line Railway, whereby the Detroit & Toledo Shore Line Railway enjoins trackage right privileges over 11 miles of our railroad, this privilege having been granted them by the contract of 1903 for a period of 99 years, entered into by the presidents of the respective companies at that time. This contract, however, was canceled by the former receivers of the D., T. & I. Ry., and was acknowledged as canceled by the general manager of the D. & T. S. L. Ry., for the reason that conditions were so changed that the contract as was in existence of 1903 was not fair to the D., T. & I. Ry., from the fact, as is shown by attached statement, that the D. & T. S. L. Ry. had more than doubled their business, for which the D., T. & I. Ry. did not derive any benefit, excepting the increased proportion of the maintenance and operation.

"In view of this fact, I am inclosing copy of the original contract and proposed contract to be entered into between the D., T. & I. Ry., and the D. & T. S. L. Ry., granting the D. & T. S. L. Ry. trackage rights between Trenton and West End avenue, Detroit, in lieu of the contract entered into between the Detroit Southern Railroad and the Detroit & Toledo Shore Line Railway, on the 1st day of July, 1903. Under this contract of 1903 the Shore Line paid the D., T. & I. Ry. $6,000 per year rental and the cost of operation and maintenance based on wheelage."

This letter, and Bannard's other admissions above mentioned, establish that he had definite notice of the contract of July 1, 1903, although Johnson, receiver, had informed him that this contract had been "canceled" by the receivers. As above stated, Bannard became one of the purchasers at the foreclosure sale on June 28, 1913, and the sale was confirmed by order of this court dated October 20, 1913. The foreclosure decree, entered May 4, 1911, and as later amended, and which was of similar scope as the 1905 decree, with the exception that the latter had no disavowal provision, contained the following provisions:

"And such purchaser [the purchaser at the foreclosure sale] shall in all respects be substituted to all and singular the rights of the said complainant and the said defendant railway company [the Detroit, Toledo and Ironton Railway Company], and the said receiver, in, to, or concerning the said property, or arising from the management or operation thereof."

"The receiver and the defendant railway company, upon such sale being made and confirmed, shall, if requested by the purchaser, join with said master commissioner in the deed to be made by him as aforesaid, or shall otherwise make, execute, and deliver to the purchaser or assigns good and

sufficient deeds of conveyance or evidence of transfer of all property vested in the receiver or the defendant railway company, or standing in his name, or to which he had in any manner acquired right, title, or ownership, and in case of failure so to make such conveyance or transfer this decree shall operate as such.

"Upon the exhibition of the said special master's deed and upon the request of the grantee or grantees in such deed, or his or their assigns or appointees, the receiver herein shall let the said grantee or grantees, or his or their assigns or appointees, into possession of the premises and property conveyed, and the said receiver, or any party to this suit having possession thereof, shall deliver any of the premises and property sold which may be in his or its possession to such grantee or grantees, or his or their assigns or appointees, together with any property and income acquired or received in the management or operation of the said premises, which may then be in the receiver's hands and subject to such disposition. * * *

"The purchaser or purchasers, or his or their successor or successors or assigns, may within 90 days after the confirmation of the sale of the property disavow, renounce, and relinquish any contract or lease, or the rights thereunder, which are part of the property to be sold [except any receiver's contracts for the purchase or the repair of equipment subject to which the sale shall have been expressly made]. Such disavowal or disavowals shall be made by instrument in writing and signed and verified by the said purchaser or purchasers, or their successor or successors or assigns, and shall contain a general description of the contracts and leases which he or they shall disavow, renounce and 'relinquish, and shall be filed with the clerk of this court within the aforesaid period. * * * Upon such filing of such disavowal or disavowals, the said purchaser or purchasers, or their successor or successors or assigns, shall be deemed not to have purchased the said contracts or leases or rights thereunder therein described, or to be bound by the obligations of said contracts or leases. * * *

"Unless disclaimed in the manner and within the time above provided, contracts and leases of which the purchaser has notice after inquiry made of the receivers shall be deemed adopted by him."

The disavowal period commenced October 20, 1913, and expired January 18, 1914. There is no evidence that any representative of the plaintiff had any actual knowledge of these disavowal provisions until some months after the expiration of the disavowal period. The record does not show that during this period either Bannard or Buckner made any inquiry whatever of the receiver relative to existing contracts or leases which were part of the property sold. No disavowal notice whatever was filed by them during the period prescribed, and in fact none was ever filed relative to this or any other contract until in the following May, and the notice then filed related to property other than that here involved, having been of a lease of property on Jefferson avenue, Detroit.

The present defendant, Detroit, Toledo & Ironton Railroad Company, was incorporated in February, 1914. Under date March 1, 1914, there passed to it the master's deed of the property sold, in which joined the Detroit, Toledo & Ironton Railway Company, the receiver, Johnson, and the purchasers, Bannard and Buckner. This conveyance vested in the defendant all the property which had been covered by the mortgages and all other rights or interests which had been vested in the Detroit, Toledo & Ironton Railway Company or the receiver, up to the execution of said deed.

After the organization of the present defendant, and the passing to it of the conveyance dated March 1, 1914, its president, Kurn, sub-

mitted to plaintiff a draft of a proposed new contract, calling for an annual rental of $18,000, and containing somewhat different terms. This proposed new contract contained the following recitals:

"Whereas, on the 1st day of July, 1903, a contract was entered into by and between the Detroit Southern Railroad Company and the said Shore Line Company providing for the use of said tracks by said Shore Line Company, which contract it is hereby understood and agreed is superseded and canceled by this agreement; and

"Whereas, the Shore Line Company has assumed all the obligations arising out of said contract of July 1st, 1903, as between said Shore Line Company and said Detroit Company (meaning defendant, the Detroit, Toledo and Ironton Railroad Company)."

Some correspondence followed between the plaintiff and the defendant relative to this proposed new contract. Defendant notified plaintiff, under date April 21, 1914, that this proposed contract would be put in force and effect on May 1, 1914. Plaintiff replied, under date April 24, 1914, advising defendant that it claimed the contract of July 1, 1903, to be still in full force and effect. Further correspondence followed, and commencing for the month of June, 1914, defendant billed plaintiff for the use of these tracks on the basis of the proposed new contract, but plaintiff only paid rental and other charges on the basis of the contract of July 1, 1903, and defendant threatened to bar plaintiff from further use of the tracks in question. Up to the bill for June rental, those rendered by the receiver until the termination of the receivership, March 1, 1914, and by the defendant for the months up to June, 1914, continued to make reference to the contract of July 1, 1903, as the basis therefor, and plaintiff's vouchers issued thereon in payment thereof made like reference. After the rendition of defendant's bill for the June rental, an arrangement was made between the parties whereby rental and other charges were to be paid on the basis of the contract of July 1, 1903, but without prejudice to defendant's claimed rights.

This suit was commenced in September, 1914, and a temporary injunction was issued against the defendant, restraining it from interfering with the plaintiff's use of the tracks in question. On motion made by defendant for the dissolution of this temporary injunction, it was continued, on condition that plaintiff should file an undertaking— which it promptly did—to satisfy any decree which might be made against it, in the event its contention with reference to the continued binding force and effect of the contract of July 1, 1903, should be found to be unsound. The defendant filed an answer to the plaintiff's bill, and subsequently an amended bill and amended answer were filed.

On plaintiff's motion, the cause was referred to the standing master in chancery of this court, as special master, to take and report the testimony, together with findings of fact and conclusions of law thereon. The master has heard the testimony offered by the parties, and, after oral arguments and briefs by counsel for the parties, has made a very able and exhaustive report, under date of February 5, 1923, in which he has advised that the plaintiff's bill of complaint should be dismissed. Both parties have filed exceptions to the report, and the defendant has also filed motions for the confirmation of the report, and for the as-

sessment of damages under the undertaking given by the plaintiff above mentioned. The exceptions of the parties have been fully orally argued before me, the arguments occupying 3½ days, and I have reached the conclusion that the master was in error.

The defendant's exceptions relate to the conclusions of the master, first, in overruling defendant's position that the rental reserved by the contract for the use of the tracks in question is so inadequate and unreasonable as to render the contract unfair and unconscionable, and therefore that a court of equity should not lend its aid in enforcing this contract; and, second, to the effect that the contract of July 1, 1903, passed to the Detroit, Toledo & Ironton Railway Company—

"either by the deed from the master or under the conveyance from the receiver and the Detroit Southern, to, and became vested in, the said Detroit, Toledo & Ironton Railway Company, subject to acceptance by the latter, which, after such acceptance, became a party to, and bound by, said contract, as successor and assign of said Detroit Southern, and thereupon said contract became and continued in full force and effect between plaintiff and said Railway Company."

[1] Is the plaintiff entitled to specific performance of this contract, assuming that the contract is binding upon the defendant? Defendant's counsel assert that the rental fixed by this contract is grossly inadequate for the privileges enjoyed by the plaintiff, and have argued that specific performance should be refused on the ground that the contract is unfair and unconscionable for that reason. The record contains no competent evidence as to the fair rental value of these privileges. An offer was made by defendant of proof, by its president, Kurn, as to such rental value, for the period since defendant became the owner of the property; but this offer was excluded by the master, as irrelevant to any issue involved before him. There were assertions in certain of the correspondence between the receivers and the plaintiff, and in the course of the several negotiations between the receivers and the plaintiff, and between the defendant and the plaintiff, to the effect that this rental is inadequate; but these mere assertions do not meet the requirements of proof. Assuming, however, that this rental, for the period since defendant became the owner, is less than might now be considered reasonable, it does not follow that the contract is so unfair and unconscionable that its performance will not be specifically enforced by a court of equity, because there is absolutely no evidence, and no claim now made, that this contract was not fair when made. The rule is that a court of equity will not refuse specific performance of a contract on the sole ground of hardship, where it was fair when made, but has become a hard one through the force of subsequent circumstances and changing events. Marble Co. v. Ripley, 10 Wall. 339, 356, 19 L. Ed. 955; Southern Ry. Co. v. Franklin & Penn. R. R. Co., 96 Va. 693, 32 S. E. 485, 44 L. R. A. 297. Presumably the rental fixed by this contract was considered fair by the plaintiff and the Detroit Southern when it was made. The purpose of the contract was to enable plaintiff to reach the industries located along the tracks, the use of which was granted the plaintiff. Considering that the situation, with respect to business derivable from these industries, has greatly improved since the contract was made, this must be

presumed to have been in the contemplation of the parties. Defendant is not, therefore, in position to raise the claim of present hardship, which is due solely to "subsequent circumstances and changing events."

[2] The privileges granted plaintiff by this contract were of a continuing nature, and the remedy at law, if plaintiff should be excluded by defendant from the enjoyment of these privileges, would be wholly inadequate, neither plain nor complete, nor a reasonable substitute for the remedy in equity. Further, considerations of the interests of the public are involved, as the exercise by the plaintiff of the rights granted by the contract enables it to serve the industries located along these tracks. The inadequacy of the remedy at law, and the considerations of the public interest indicated, require this court to decree specific performance of this contract against the defendant (Joy v. St. Louis, 138 U. S. 1, 46, 47, 50, 11 Sup. Ct. 243, 34 L. Ed. 843), if the contract is legally binding upon the defendant. Defendant's exceptions in this regard are therefore overruled.

[3] Did the contract in question pass to, and become vested in, the Detroit, Toledo & Ironton Railway Company by virtue of the foreclosure sale and conveyance in 1905? If the contract be considered "after-acquired" property of the Detroit Southern, with respect to its outstanding trust mortgage of June 1, 1901, then it passed as a result of the foreclosure sale, and the deeds following, to the Detroit, Toledo & Ironton Railway Company; or, if the contract be considered as not such "after-acquired" property, then it still passed to the Detroit, Toledo & Ironton Railway Company by virtue of said deeds and bills of sale, as a right or interest resting in the Detroit Southern, or the receiver, which joined in the deeds and bills of sale then given. Further, this contract, having been performed by the Detroit, Toledo & Ironton Railway Company, must be considered as having been adopted by it. It is therefore not necessary to determine whether the Detroit, Toledo & Ironton Railway Company might have rejected this contract.

The deeds of May 1, 1905, conveyed, among other things:

"The tolls, income, rents, issues, and profits thereof (that is, formerly belonging to the Detroit Southern), and other property held by said railroad company in connection therewith, and all rights, franchises, and privileges pertaining thereto."

This contract was property of the Detroit Southern; income, rents, etc., accrued under it, first to the Detroit Southern, and then to the Receiver. The language of these conveyances was sufficient to pass this contract to the Detroit, Toledo & Ironton Railway Company. These deeds, from the receiver and from the Detroit Southern, were given pursuant to the foreclosure decree, which contemplated the sale and transfer, not only of the interest of the mortgagee, that is, the "mortgaged" property, but also of the property of the receiver and of the Detroit Southern. These deeds, therefore, operated to pass any property, resting in the Detroit Southern or the receiver, which was not part of the mortgaged property sold.

The case of Detroit, Toledo & Ironton Railroad Co. v. Western Union Telegraph Co., 200 Mich. 2, 166 N. W. 494, presents a similar situation to that here under consideration, having involved a contract

claimed by the telegraph company to have been terminated as a result of the second foreclosureship (1908–1914), and it was there held that, "if the railway's interest in the contract [there involved] was not covered by the mortgage [which was prior to the date of the contract there involved] it must have been an asset of the company which passed to the custody of the receiver, and from him and the railway company to plaintiff, under the deeds and bills of sale"; the deeds and bills of sale having been of exactly similar nature as those given in 1905. This is sufficient to dispose of defendant's exceptions in this regard, and they are therefore overruled.

The plaintiff's exceptions relate to the conclusions of fact and law of the master to the effect that the contract of July 1, 1903, did not pass to the purchasers at the foreclosure sale held on June 28, 1913, and did not vest in the defendant by the deed of March 1, 1914, and therefore that the defendant is not bound by that contract; that the plaintiff is estopped from asserting that this contract thus passed and vested, and that it had not been canceled during the receivership; and that Bannard and Buckner were bona fide purchasers without notice of this contract. Plaintiff's exceptions raise the further question whether this contract was adopted by the purchasers and the defendant, following the confirmation of the sale on October 20, 1913. It is not questioned that this contract was of a personal, executory nature, which did not "run with the land."

[4-6] As above stated, the legal effect of the arrangement made between plaintiff and the receivers in 1909 is in dispute; defendant claiming that its effect was to terminate this contract for all purposes, and plaintiff claiming that its effect was only to reserve to the receivers the right to reject the contract at any time during the receivership, and that the receivers as such had no legal authority to terminate or cancel the contract as between the parties thereto; that the receivers could only reject it as binding upon them. The rule is firmly established that receivers may, within a reasonable time after taking possession of property subject to their receivership, elect whether to adopt or reject executory personal contracts pertaining to such property, and that, if they do not reject within a reasonable time, but continue to give and accept performance of such contracts, they become bound thereby. As above stated, the order appointing the receivers in question, which was entered in February, 1908, provided that they should not, without the previous approval of the court, elect to affirm, ratify, or continue any contract or lease held or owned by the Detroit, Toledo & Ironton Railway Company, and this order gave them six months within which to exercise such election. While they took no action to adopt or reject the contract in question within the six months thus given, and while the giving and accepting of performance by them beyond this term could perhaps not be claimed to have constituted adoption of this contract by them in view of the reservation in the order of their appointment (Landon v. Pub. Util. Com. of Kan. [D. C.] 245 Fed. 950), it is my opinion that that arrangement had the effect of definitely reserving to them the right to reject the contract at any time during the receivership, with no opportunity to plaintiff to dispute their right of

rejection, and that that was its sole effect. These receivers as such had no authority to cancel or terminate this contract as between the parties thereto. The rule is well settled that receivers have no power to annul or abrogate an executory contract or lease as between the parties thereto; they cannot cancel it, nor break it, as between the parties. Clark on Receivers, §§ 505, 506; High on Receivers (4th Ed.) § 273d; 34 Cyc. 258, 266; New York, etc., R. Co. v. New York, etc., R. Co. (C. C.) 58 Fed. 268; St. Joseph Gas Co. v. Attorney General (D. C.) 243 Fed. 206. But the rule also seems settled that a receiver may enter into an arrangement whereby he reserves to himself the right to adopt or reject at any time during the receivership; in other words, an arrangement whereby the giving and accepting by him of performance shall not constitute adoption. Thomas v. Cincinnati, etc., R. Co. (C. C.) 77 Fed. 667.

[7] Following the arrangement between plaintiff and the receivers in 1909, plaintiff continued to use the tracks covered by the contract exactly as before, during the remainder of the receivership, and to pay rental to the receivers under the billing and vouchering method above described; reference being made to the contract in practically every instance of payment as the basis thereof. The plaintiff thereby obtained the enjoyment of every privilege granted it by the contract, and such performance prevented any effective breach on the part of the Detroit, Toledo & Ironton Railway Company. As said in Detroit, Toledo & Ironton R. Co. v. Western Union Telegraph Co., 200 Mich. 2, 6, 7, 166 N. W. 494, 496:

"While the railway company became unable to carry out its contract on account of insolvency, its obligations thereunder appear to have been discharged by the receiver."

If the foreclosureship suit had not resulted in a sale, and the property of the Detroit, Toledo & Ironton Railway Company had been returned to it, the contract in question would have been just as binding upon that company as though the foreclosureship had not been commenced. Farmers' Loan & Trust Co. v. Chicago, etc., R. Co. (C. C.) 44 Fed. 653.

Therefore, in my opinion, this contract continued throughout the receivership as a good and binding contract of the Detroit, Toledo & Ironton Railway Company, with no effective breach thereof, of which the plaintiff could have complained. The receivers, at any time during the receivership, might have refused to permit further use of the tracks by plaintiff; but they at all times gave and accepted all things promised in the contract. As this contract was thus brought down to the sale, on June 28, 1913, and to the conveyance on March 1, 1914, as a live, binding contract of the Detroit, Toledo & Ironton Railway Company, it passed at the sale, and became vested in the defendant by the conveyance.

[8] Having held as above that this contract passed at the 1905 foreclosure sale and vested in the Detroit, Toledo & Ironton Railway Company by the deeds and bills of sale then given, it follows that it was covered by the mortgages which were foreclosed 1908 to 1914, and that it was part of the "property sold" at the foreclosure sale on

290 F.—36

June 28, 1913, and that it then passed as mortgaged property, and not merely as property of the railway company, or the receiver, outside of the mortgages, as may have been the case on the 1905 foreclosureship sale and conveyance.

[9] Defendant claims that plaintiff is estopped from asserting that this contract was not "canceled" for all purposes; that the conduct of plaintiff's representatives following the arrangement of June, 1909, their correspondence and negotiations with the receivers on the claimed (by defendant) basis that there was no valid, existing contract covering the privilege enjoyed by plaintiff, precludes it from now asserting the continued existence of the contract in question. It is true that the receivers asserted to plaintiff's representatives, during the 1909 negotiations, and subsequently, that this contract had been "canceled," and it is also true that certain of plaintiff's representatives may have believed, and acted upon the assumption, that this contract was thus canceled; but I am convinced that the understanding of the receivers, and the plaintiff's representatives, in this respect, was in error as a matter of law. For this erroneous understanding, plaintiff's representatives were certainly not more responsible than were the receivers themselves; in fact, the receivers were the ones who first asserted to plaintiff's representatives this erroneous assumption.

[10] The foreclosure sale, held on June 28, 1913, at which Bannard and Buckner became the purchasers, was confirmed on October 20, 1913, and the 90-day disavowal period fixed by the foreclosure decree, within which the purchasers might renounce executory contracts or leases which they did not desire to assume, expired January 18, 1914. This disavowal provision provided that:

"Unless disclaimed in the manner and within the time above provided, contracts and leases of which the purchaser has notice after inquiry made of the receivers, shall be deemed adopted by him."

[11] As already stated, the record does not show that Bannard and Buckner made any inquiry of the receiver, during the disavowal period, as to the existence of contracts and leases which passed, as aforesaid, at the sale. As above stated, Bannard knew of the plaintiff's use of the tracks in question during the receivership, and had been furnished by the receiver, in March, 1913, with a copy of the contract of July 1, 1903, but had been told by the receiver that this contract had been "canceled." He made no inquiry of the plaintiff whether it denied this contract had been "canceled" for all purposes, and the plaintiff did not, until after the expiration of the disavowal period, affirmatively assert its claim as to the continued binding force and effect of this contract. The plaintiff made no misrepresentation which could or did mislead the purchasers in this regard. The facts were as well known to the purchasers, or could have been as well known, as to the plaintiff. Under such circumstances, it does not seem to me that any legal duty rested upon the plaintiff to assert to the purchasers, before the expiration of the disavowal period, its claim that this contract would continue in full force and effect, unless the disavowal provisions were complied with. The misunderstanding of the purchasers, and of plaintiff's representatives as well, was as to a matter of law, the authority of,

the receivers to cancel or terminate this contract between the parties thereto. Even had plaintiff's representatives not then been laboring under a misunderstanding, and even had they known that the purchasers were laboring under such a misunderstanding, no duty to speak would have rested upon plaintiff, because the facts, forming the basis of such erroneous understanding, were as well known to the purchasers as to the plaintiff; at least, the purchasers had notice of the facts and equal means of knowledge with the plaintiff. Fellows v. National Can Co., 257 Fed. 970, 976–978, 169 C. C. A. 120. In my opinion, therefore, there is no foundation for the application of the doctrine of estoppel as against the plaintiff.

[12] The statement by Johnson, receiver, to Bannard, to the effect that the contract in question had been "canceled," was merely the expression of his opinion on a matter of law, and Bannard had no right to reply upon this opinion, but was bound to know the legal status of this contract, which the facts, known to him or of which he had notice and could have learned, established. The purpose of the "inquiry" clause of the disavowal provision was not to obviate the duty of the purchasers to act with respect to their knowledge of facts, nor to permit them to rely upon the opinion of the receiver as to the legal situation resulting from known facts, or from facts of which they had notice and the means of knowledge. Here they did have knowledge, or notice of facts inquiry in relation to which would have developed full knowledge. Further, as above stated, it does not appear that the purchasers, during the disavowal period, made any inquiry whatever of the receiver as to existent contracts or leases. Therefore they are clearly not entitled to assert that they relied upon information given them by the receiver, and that, relying upon such information, they failed to comply with the requirements of the disavowal provision. Their failure to comply with these requirements cannot be said to have been due to absolute ignorance of the contract in question, but rather to their unwarranted reliance upon the mere opinion of the receiver to the effect that the contract had been canceled and terminated for all purposes, if such was their understanding of the opinion of the receiver.

Further, the purchasers having taken no steps, during the 90-day disavowal period to comply with the disavowal provision with respect to any contract or lease whatever, it seems to me their failure in this regard as to the contract in question is attributable to their carelessness or forgetfulness rather than to any conduct on the part of plaintiff's representatives now claimed by defendant to work estoppel.

These purchasers, having had knowledge, or the means of knowledge, with respect to the legal status of this contract, could have rejected it as binding upon them, and subsequently upon the defendant, by compliance with the requirements of the disavowal provision. The "inquiry" clause of the disavowal provision was a sort of emphasized warning of the doctrine of caveat emptor, as well as the imposition of a positive duty of inquiry, inasmuch as the scope of the decree resulted in the passing of all existent contracts and leases at the foreclosure sale, rather than an assurance of the nonexistence of contracts

and leases in the event the receiver should express an opinion of their nonexistence, but should give information of facts which, if investigated would have disclosed the existence of contracts or leases; in other words, the purchasers could not permit themselves to be lulled into a sense of security by the opinion of the receiver, they having knowledge, or notice of facts and the means of knowledge, to the contrary. The purpose of the disavowal provision was to enable the purchasers to renounce contracts or leases, which were part of the property sold, but which they might not desire to assume. Compliance by them with the requirements of the disavowal provision was necessary, however, in order to enable them to avoid the assumption of such contracts or leases, and where, "through carelessness or forgetfulness" (Fellows v. National Can Co., supra), they have neglected such compliance, this court now has no power to relieve them, or the defendant, of the consequences of their neglect. It follows that the contract in question having come down to the foreclosure sale as a valid, binding contract, and having passed at the sale to the purchasers, and they not having renounced it in the manner prescribed during the disavowal period, and it having vested in the defendant by the conveyance of March 1, 1914, is now, and has been since the execution of said conveyance, vested in the defendant, as fully, and with like binding force and effect, as though originally made between the plaintiff and the defendant. The plaintiff's exceptions to the master's report in this regard must therefore be sustained, and any findings or conclusions of the master inconsistent with this opinion must be reversed and set aside.

Plaintiff has also contended that the performance of this contract during the disavowal period and by defendant following the execution of the deed of March 1, 1914, up to the sending of the bill for June, 1914, rental, constitutes an adoption of this contract by defendant. This contention is based upon the principles applied in the case of Wichita Union Terminal Ry. Co. v. Kansas City, Mexico & Orient R. Co., 105 Kan. 262, 182 Pac. 535, where a similar disavowal provision was under consideration, and where the purchaser had for a time accepted performance of a contract which it later sought to repudiate. Holding, as I do, that the contract in question passed at the foreclosure sale to the purchasers, and vested in and became binding upon defendant on the execution of the deed of March 1, 1914, it is unnecessary for me to pass upon this contention of plaintiff, because, as the contract thereby became binding upon defendant, the question whether it subsequently by its conduct adopted this contract is immaterial. Should it be held to have thereby adopted this contract, the effect would be only cumulative, in holding it bound thereby.

Having reached the conclusion that the plaintiff is entitled to the relief prayed, by way of specific performance and injunction, it follows that defendant's motions for confirmation of the master's report, and for assessment of damages, must be denied. A decree will be entered in accordance with this opinion.